```
           IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

Larry W. Seevers,                 :

    Plaintiff,                :

  v.                              :  Case No.  2:14-cv-511

                                       :  JUDGE GREGORY L. FROST
Commissioner of Social Security,     Magistrate Judge Kemp

    Defendant.                :

                       REPORT AND RECOMMENDATION

                         I.  Introduction

Plaintiff, Larry W. Seevers, filed this action seeking review of a decision of the Commissioner of Social Security denying his application for supplemental security income.  That application was filed on May 4, 2010, and alleged that Plaintiff became disabled on December 15, 2004.

After initial administrative denials of his claim, Plaintiff was given a video hearing before an Administrative Law Judge on February 21, 2012, and a supplemental hearing on November 13, 2012.  In a decision dated December 21, 2012, the ALJ denied benefits.  That became the Commissioner's final decision on April 1, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on August 8, 2014.  Plaintiff filed his statement of specific errors on September 8, 2014, to which the Commissioner responded on December 9, 2014.  Plaintiff filed a reply brief on December 23, 2014, and the case is now ready to decide.

  II.  Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 36 years old at the time of the first administrative hearing and who has a high school diploma (having

been in special education classes from the fifth grade on), testified as follows.  His testimony appears at pages 35-41 and 51-55 of the administrative record.

At the first administrative hearing, Plaintiff testified that the best job he had was doing construction for a firm in Cutler, Ohio.  However, the firm closed its construction operations and he was left without a job.  He worked for a short time afterward at several different places, but began having difficulty concentrating and being around people.  He had not worked since 2005.

At the second hearing, Plaintiff testified that he had recently lost two family members and had been "up and down" since then.  He had attempted to do some painting work but could not climb a ladder due to knee problems.  He also had episodes where his attention lapsed.

### III. The Medical Records

The medical records in this case are found beginning on page 325 of the administrative record.  The pertinent records - those relating to Plaintiff's two statements of error - can be summarized as follows.

The first medical record is a mental residual functional capacity assessment from Dr. Meyer, a state agency reviewer.  He concluded that Plaintiff had a number of moderate limitations, including in the area of getting along with coworkers and the public and dealing with workplace stress, but that his impairments did not meet or equal any listed impairment.  He said Plaintiff could do simple and moderately complex routine work in a stable work setting without much interaction with others.  (Tr. 304-21).

Next, L&P Services, Inc., performed a diagnostic assessment on April 23, 2010.  Plaintiff reported being unable to focus or pay attention sufficiently to be able to work.  He described

depression, lack of appetite, excessive sleeping, and low energy. He had been prescribed Paxil by his family physician but it had done nothing for his lack of attention, and he also suffered from anxiety.  Additionally, he reported daily mood swings.  He had recently lost a close relative due to suicide.  He was diagnosed with major depressive disorder and bereavement, and psychiatric assessment and support as well as individual therapy were recommended.  His GAF was rated at 50.  (Tr. 370-80).

    At the follow-up psychiatric assessment, Dr. Jache noted that Plaintiff described similar symptoms to her.  She described him as "quite depressed and despondent, preoccupied with those he's known who have died, what happens after death."  She changed his medications, and rated his GAF at 45.  (Tr. 385-90).  The next time she saw him, his mood was improved, and she increased his GAF rating to 55.  (Tr. 391-93).  By October of 2010, he was "picking up handy jobs" and "doing things around the house," (Tr. 394-96), and by December he reported that he had not felt that good in a long time.  (Tr. 397-99).  Dr. Chambly, another state agency reviewer, considered these records and affirmed Dr. Meyer's opinion.  (Tr. 400).

    Dr. Jache's progress notes for the first part of 2013 showed a continuing diagnosis of moderate depression and a GAF of 55. However, on April 26, 2011, another diagnostic assessment was completed.  At that time, all of Plaintiff's psychiatric disorders were described as "in remission," and his GAF had improved to 81.  (Tr. 404-05).  Nevertheless, Dr. Jache's notes after that date still showed recurrent moderate depression, but with an increase in GAF to 65 or 70.

    Jon Alan Bova, a mental health source with L&P Services, completed a psychiatric evaluation on November 8, 2011. Plaintiff was by then a "former patient" of Dr. Jache.  Plaintiff said he was doing well on Wellbutrin but had a recent encounter

with a neighbor which led him to seek additional counseling. He was cooperative and coherent during the examination but somewhat hyperactive and restless. His Axis I diagnosis was major depressive disorder and his GAF was rated at 60. His medication was continued and he was to return in two months for medication monitoring. (Tr. 420-22). Mr. Bova completed a functional assessment form in March, 2012, indicating that Plaintiff had multiple marked limitations and that he was paralyzed by extreme anxiety and emotional instability. (Tr. 476-78).

Dr. Leisgang, a psychologist, performed a consultative evaluation on April 27, 2012. Plaintiff described himself as depressed half the time and said that he was easily distracted. He had not been in counseling for the past year. His daily activities included performing household chores and preparing meals. He could follow simple recipes and shop for groceries. He had occasional contact with friends and relatives. During the examination, he appeared anxious and sullen at times. His memory and attention were marginally adequate. Plaintiff's full-scale IQ was measured at 76 and he appeared to be functioning in the low average range of intelligence. Dr. Leisgang diagnosed an anxiety disorder with depressed mood and rated his GAF at 60. She thought he would have problems with completing simple tasks due to his anxiety and decreased attention and concentration skills and that he would have difficulty coping with major changes in the work environment. (Tr. 425-32).

## IV.  The Medical Testimony

Dr. Brendemuehl, a medical expert, testified at both administrative hearings. At the first hearing, she said that the record did not support any exertional limitations. (Tr. 45). She confirmed that testimony at the second hearing. (Tr. 55). Another medical expert, Dr. Buban, also testified at the first hearing. She said first that a consultative examination might be

helpful.  She did, however, note a diagnosis of major depressive disorder and generalized anxiety disorder for a period of over a year, during which Plaintiff was also experiencing bereavement, and thought that he had mild limitations in activities of daily living and marked impairment in the areas of social functioning and concentration, persistence, and pace during that year (which would satisfy the "B" criteria for many of the Listings relating to mental impairments).  (Tr. 42-44).

    A different psychological expert, Dr. Linton, testified at the second administrative hearing.  He identified Exhibit 13F, Dr. Leisgang's consultative examination report, as being the "bedrock" for a functional analysis, and said that Plaintiff should work only in a low-stress environment which was relatively uncomplicated.  He also agreed with the diagnosis of an anxiety disorder not otherwise specified and ADHD, although that was under good control.  Dr. Linton said that the records supported the presence of a learning disorder as well.  Those combined to produce only one moderate limitation, as defined by the "B" criteria, in the area of concentration, persistence, and pace.

    Dr. Linton was then asked about Dr. Buban's testimony concerning the period from May, 2010 to November, 2011, when she thought that Plaintiff's mental impairment was severe enough to satisfy the Listing of Impairments under sections 12.04 and 12.06.  He replied that he "wouldn't have a problem with that, you know?"  (Tr. 59-60).  He augmented this testimony by saying that he had "no reason to disagree with that" opinion.  (Tr. 61).

### V.  The Vocational Testimony

    Patricia Posey was the vocational expert in this case.  Her testimony begins on page 65 of the administrative record.

    Ms. Posey was asked some questions about a hypothetical person who could work at any exertional level.  The person was limited to simple, repetitive tasks and could not work in a

public service capacity but could tolerate some interaction with the public.  He also needed a stable work environment without changes in situation.  She responded that such a person could work as a basket filler, hand packer, and dryer attendant.  However, someone who was off task 20 percent of the time on a consistent basis could not do those or any other jobs.

V. <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 14-21 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff had not engaged in substantial gainful activity since his application date of May 4, 2010.  Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including depression, anxiety, a learning disorder, and attention deficit hyperactivity disorder.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, with the following nonexertional limitations: he was limited to simple routine work tasks, could not work in a public service capacity, and could tolerate interactions with the public.  He also required a stable work environment with no changes in work routine.  The ALJ found that, with these restrictions, Plaintiff could not do his past work.  However, he also determined that Plaintiff could do the jobs identified by the vocational expert, including hand packer, basket filler, and dryer attendant.  The ALJ further found that such jobs existed in significant numbers in the regional and national economies.  Consequently, the ALJ

concluded that Plaintiff was not entitled to benefits.

> VI. <u>Plaintiff's Statement of Specific Errors</u>

In his statement of specific errors, Plaintiff raises these issues: (1) the ALJ failed to weigh properly all of the medical evidence of record, particularly the opinions of Drs. Buban and Linton concerning a closed period of disability; and (2) the ALJ failed to incorporate into her residual functional capacity all of the mental limitations she found to exist. These issues are evaluated under the following legal standard.

<u>Standard of Review.</u> Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" <u>Id</u>. <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. <u>Kinsella v. Schweiker</u>, 708

F.2d 1058, 1059 (6th Cir. 1983).

### A. Weighing the Medical Evidence

As Plaintiff notes in his statement of errors, the way in which the ALJ weighed and considered the opinions of the testifying medical experts, Drs. Buban and Linton, "give[s] rise to [Plaintiff's] first challenge to the ALJ's decision." Statement of Errors, Doc. 11, at 10. Although the ALJ said she gave "some weight" to Dr. Buban's opinion, Plaintiff contends that she actually rejected that opinion, at least to the extent that Dr. Buban testified in a way that would support a closed period of disability. The ALJ then purported to give "great weight" to Dr. Linton's testimony but, according to Plaintiff, failed to recognize that Dr. Linton agreed with Dr. Buban about a closed period of disability, and mischaracterized the testimony as having been prompted by counsel's questioning and not really an acknowledgment of the correctness of Dr. Buban's opinion. Plaintiff further argues that the ALJ's rejection of the testimony of both experts that a closed period of disability existed was not supported by the evidence.

In response, the Commissioner asserts that the ALJ was not required to give any special weight to opinions about a closed period of disability, and that the evidence supported the ALJ's finding that Plaintiff did not satisfy the Listing of Impairments, even for a closed period. The Commissioner further argues that Dr. Buban's opinion about marked impairments is not supported by, and is inconsistent with, the record as a whole, especially Dr. Leisgang's evaluation. Finally, while acknowledging that the ALJ did not fully appreciate the fact that Dr. Linton agreed with Dr. Buban's opinion about a closed period of disability, the Commissioner characterizes this omission as harmless error because the ALJ had sound reasons for rejecting Dr. Buban's opinion, and they apply equally to any other opinion

-8-

which suggested the same result.

   The Commissioner has the better of this argument.  Had the ALJ rejected Dr. Buban's testimony on the sole basis that Dr. Linton did not agree with her, that would have been error. However, a close review of the administrative decision shows that the ALJ had other reasons as well for declining to adopt Dr. Buban's opinion, and that those reasons find support in the record.

   In the section of her report devoted to the Listing of Impairments, the ALJ specifically addressed the "B" criteria, finding, first, that Plaintiff had only mild restrictions in his activities of daily living based on his ability to do household chores, prepare meals, shop, and manage household finances. Second, the ALJ found, contrary to the medical experts' opinions for the closed period in question, that Plaintiff had only moderate difficulties in social functioning, because he did socialize with family and a few friends, and also did some odd jobs to earn money despite preferring not to be around people. The medical records cited above support this finding.  Third, the ALJ concluded that Plaintiff had only moderate difficulties in the area of attention, concentration, and pace, noting that he was able to manage finances, follow simple recipes, and play video games, as well as maintaining an active facebook account. Again, there is factual support for this finding, and Plaintiff does not argue otherwise.

   More importantly, when discussing Dr. Buban's opinion as it related to Plaintiff's residual functional capacity, the ALJ reviewed the L&P records, pointing out that Plaintiff showed marked improvement between April, 2010 and October, 2010.  (Tr. 22-23).  She also referred to the April, 2011 evaluation which reflected a GAF of 81 and the fact that all of his psychological conditions were in remission.  (Tr. 23).  She then noted that Dr. Leisgang's opinion after the consultative examination was that

Plaintiff could work with some restrictions. Id. After rejecting the findings of Mr. Bova as inconsistent with L&P's own treatment notes - a conclusion that Plaintiff does not contest - the ALJ discussed Dr. Buban's testimony. Her conclusion that, from May 4, 2010 (Plaintiff's application date) through November 8, 2011, Plaintiff's depressive disorder caused marked limitations in both social functioning and in concentration, persistence, and pace was rejected because those findings were not supported by the objective record.

The objective record, as described in the ALJ's decision and as summarized above, does not appear to provide any support for Dr. Buban's conclusion, particularly as to the existence of marked limitations in any area which persisted for more than a twelve-month period. The treatment notes do, as the ALJ stated, indicate a significant improvement in Plaintiff's condition after only a few months of treatment, and the statement by the treating agency that his disorders were all in remission by April of 2011 is extremely difficult to reconcile with Dr. Buban's view that such severe limitations persisted through November of that year. Dr. Jache's notes also support the proposition that Plaintiff was improved enough to warrant a change in his GAF to one which indicated only mild symptoms. Given this record, there is substantial support for the ALJ's rejection of Dr. Buban's opinion without reference to whether Dr. Linton actually agreed with her or, as the ALJ seemed to think, simply deferred to the views of a colleague out of professional courtesy. For these reasons, the Court finds no reversible error in the way in which the ALJ evaluated or weighed the medical opinion evidence.

### B. The Mental Limitations

Plaintiff's second argument is based in substantial part on the Court of Appeals' decision in Ealy v. Comm'r of Social Security, 594 F.2d 504 (6th Cir. 2010). Ealy held that, in certain circumstances, restricting a claimant to the performance

of simple, repetitive tasks, did not adequately account for limitations in concentration, persistence, and pace.  Plaintiff argues that the ALJ found him to have such limitations, but did not include any pace-based restrictions in the residual functional capacity finding, thus committing "the exact same error as the ALJ in the <u>Ealy</u> case."  Statement of Errors, Doc. 11, at 14.  According to Plaintiff, this error rendered the vocational testimony unreliable and requires remand.  The Commissioner argues that, on the contrary, <u>Ealy</u> is simply not applicable here because of differences in the evidence and in what limitations the ALJ actually found to exist.  To resolve this issue, the Court must examine the <u>Ealy</u> decision, and cases in this District which have construed and applied that decision, in some detail, as well as examine the ALJ's actual findings.

   The Court begins with the ALJ's decision in this case.  In that portion of the decision relating to the Listing of Impairments, the ALJ did find that Plaintiff had moderate difficulties with regard to concentration, persistence, and pace. The ALJ emphasized at the conclusion of that section, however, that "[t]he limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment ...."  (Tr. 21).  That is correct, and this Court has so acknowledged.  <u>See Dotson v. Comm'r of Social Security</u>, 2014 WL 6909437 (S.D. Ohio Dec. 8, 2014).  Those findings are used for the sole purpose of determining if a Listing has been satisfied.  The pertinent question, for purposes of applying <u>Ealy</u>, is what the ALJ decided about Plaintiff's mental residual functional capacity when addressing step four of the sequential evaluation process.

   The ALJ gave "great weight" to Dr. Linton's testimony about Plaintiff's functional capacity.  (Tr. 25).  Dr. Linton, in turn, testified that he would recommend Dr. Leisgang's "mental RFC ... as being the bedrock for what's happening in this situation." (Tr. 57).  He amplified that statement by limiting Plaintiff to

-11-

work in a very low stress environment that was relatively uncomplicated, and also said that "dramatic changes in the work environment would be difficult for him to cope with ...." (Tr. 63). Dr. Leisgang, although she indicated that Plaintiff had struggles in the area of attention and concentration, did not further describe his abilities in that area, nor did she recommend any pace-based restrictions. As noted above, the ALJ translated all of this into a finding (and a hypothetical question) that limited Plaintiff to performing simple routine work tasks not done in a public service capacity, and to working in a stable work environment with no changes in work routine. Does that accurately reflect what Dr. Linton said? The Court concludes that it does not.

In Ealy, the ALJ adopted specific findings from a medical expert that limited the claimant to sustaining attention to repetitive tasks for only two-hour segments, and in a setting where speed was not crucial. The ALJ's failure in that case was to reflect these limitations, which the ALJ specifically found the claimant to have, into the question asked to the vocational expert. The Court of Appeals concluded that the "streamlined" hypothetical, which "omitted these speed- and pace-based restrictions completely" - did not accurately describe the limitations which the ALJ himself found to be present. Ealy, 594 F.3d at 516. More generally, Ealy stands for the relatively non-controversial proposition that "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." Id., citing, inter alia, Howard v. Comm'r of Social Security, 276 F.3d 235, 239-41 (6th Cir. 2002).

It is true that if a medical source who has made the finding that a claimant suffers from deficiencies in concentration,

persistence, and pace also concludes that, even with those deficiencies, the claimant can do simple, repetitive tasks in a static work environment without specific speed-based or pace-based limitations, the ALJ is entitled to rely on that expert's conclusion.  See Swanson v. Comm'r of Social Security, 2012 WL 2319250, *5 (S.D. Ohio June 19, 2012).  There, the medical expert "accommodated that restriction by limiting plaintiff to a 'static' work environment and to simple repetitive tasks.  He did not, as did the reviewer in Ealy, make any comments about the need to segment the work day or to perform tasks where pace or speed were not critical."  But that does not describe what happened here.

It is true that Dr. Linton recommended that Plaintiff work in a stable environment, or, as he described it, one without "dramatic changes in the work environment."  (Tr. 63).  He also noted that work activities should be relatively uncomplicated.  But, taking into account what he termed only "marginally adequate" short-term memory, attention, and concentration, see id., he imposed one more restriction; he stated, referring to Dr. Leisgang's report, that "the file reflects that this gentleman should probably work in a very low stress environment ...."  (Tr. 57.  That is an additional limitation which the ALJ neither discussed nor incorporated into her RFC finding.

Usually, a low-stress environment is "defined as one free of fast-paced production or quota requirement."  See, e.g., Huffman v. Astrue, 2011 WL 1002096, *5 (S.D. Ohio Jan. 24, 2011), adopted and affirmed 2011 WL 1002721 (S.D. Ohio March 17, 2011).  There is no evidence here which would allow the Court to determine if the jobs identified by the vocational expert can be performed in that type of environment.  Consequently, Plaintiff is correct that this is an Ealy-type case in that the ALJ's decision, fairly read, adopted Dr. Linton's RFC, and Dr. Linton's testimony, fairly read, required a restriction to a "very low stress work

environment." Dr. Linton did not equate a stable environment with simple tasks to one which was low-stress; he listed low stress as an additional limitation.  Under these circumstances, the vocational testimony does not support the ALJ's conclusion that Plaintiff could do the jobs identified, because no consideration was given to the need for a low-stress work environment, and a remand on this issue is necessary.

### VII.   Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that this case be remanded to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

### VIII.   Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

<pre>
                                   /s/ Terence P. Kemp          
                                   United States Magistrate Judge
</pre>